UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
KELLY HURLEY, NICOLE SKEFFINGTON, )
NICHOLAS CATANESE, and JOSEPH  )
CATANESE,                      )
                               )
            Plaintiffs,        )
                               )
v.                             )
                               )    Civil Action
ROBERT CURTIS, CHRIS BARTOLOMEI, )   No. 22-cv-12167-PBS
RONALD CARPENTER, MELISSA MARTIN, )
and JUSTIN WASKIEWICZ,         )
                               )
            Defendants.        )
_____)
```

**MEMORANDUM AND ORDER**

June 2, 2025

Saris, D.J.

**INTRODUCTION**

This civil rights action arises from a 911 call reporting a possible drug overdose at a sober home in Falmouth, Massachusetts on January 23, 2020. Plaintiffs Nicole Skeffington and Joseph Catanese allege that Falmouth Police Officer Melissa Martin, Falmouth Police Detective Ronald Carpenter (together with Martin, the "Falmouth Defendants"), and Massachusetts State Trooper Justin Waskiewicz violated the Fourth Amendment and committed false arrest and false imprisonment state-law torts when they searched the sober home. Defendants have moved for summary judgment on the grounds that they did not violate the Fourth Amendment, that they

1

are entitled to qualified immunity, and that Plaintiffs have waived their false arrest and false imprisonment state-law tort claims.

After a hearing, the Court **ALLOWS** Officer Martin's and Detective Carpenter's motions for summary judgment (Dkts. 57, 61) and **ALLOWS IN PART** and **DENIES IN PART** Trooper Waskiewicz's motion for summary judgment (Dkt. 64).

## BACKGROUND

The following facts are recounted "as a jury might reasonably find them to be in favor of [Plaintiffs], the non-movant[s]." Doe v. Brown Univ., 43 F.4th 195, 200 (1st Cir. 2022).

### I. Genesis House and Joseph Catanese

In 2016, Plaintiff Joseph Catanese purchased the property at 588 Teaticket Highway in Falmouth, Massachusetts, and began operating it as Genesis House, a sober home certified by the Massachusetts Alliance for Sober Housing. Genesis House provided housing to individuals in recovery and, while it did not offer counseling or other services, it did maintain a supply of Narcan, an opioid antidote, that was available to residents at all times. Residents were required to follow house rules prohibiting drug use, violence, theft, and late-night guests. In total, Genesis House had four bedrooms, two bathrooms, a kitchen, a living room, and a partially finished basement and could house eight to ten residents. Catanese did not live at Genesis House but maintained an office and stored personal papers there.

2

Prior to opening Genesis House, Catanese served as a police officer in Falmouth and Boston and as a Massachusetts state trooper. He also worked as a special federal officer and reported alleged corruption to the Federal Bureau of Investigation. He claims that because of his reporting, members of the Massachusetts State Police ("MSP") ostracized him. In addition, around 2018, Catanese told the Boston Globe that he believed a 1971 police shooting was not justified and disagreed with the findings by MSP investigators. He also divulged information regarding the MSP overtime payroll scandal at the Massachusetts Turnpike and Logan Airport. Catanese alleges that after a Boston Globe employee told the MSP about his comments, members of the MSP harassed him.

## II.  The January 23, 2020 Incident

On January 23, 2020, Skeffington was living at Genesis House, along with residents Christopher Geno and Andrew Plante. That afternoon, Skeffington and Geno were in the kitchen when they observed Plante behaving unusually. They encouraged him to rest on the couch in the adjoining room. About fifteen to twenty minutes later, they found him drooling and possibly not breathing. Geno called 911 around 4:46 p.m. The dispatcher guided Skeffington through chest compressions while she and Geno waited for emergency personnel.

Martin, a Falmouth police officer, arrived shortly thereafter. Geno let her in, and she immediately began CPR and

3

administered Narcan. Skeffington told Martin that Plante often "sniffed heroin." Dkt. 82 ¶ 19. Emergency medical technicians ("EMTs") arrived at 4:51 pm and transported Plante to the hospital about thirty minutes later.

While the EMTs treated Plante, Martin questioned Skeffington and Geno in the kitchen about what drugs Plante may have taken and where his phone was. Geno told Martin that he believed Plante had purchased drugs from an individual who came to Genesis House earlier that day in a red pickup truck. Skeffington said she did not know what Plante took and did not know where his phone was, but offered to help locate it. Skeffington brought Martin to Plante's room to look for the phone. While looking for the phone, Martin also searched for drugs or paraphernalia related to Plante's overdose. Besides locating Plante's passport, the search of Plante's room was unfruitful, so Skeffington led Martin back to the common areas. Eventually, they spotted the phone on a kitchen shelf. Martin did not find any drugs or paraphernalia.

Carpenter, a Falmouth police detective, arrived at Genesis House soon after to "treat the premises as a death investigation scene and to document the scene and evidence accordingly" since there was a chance that Plante may not survive the overdose. Dkt. 63-6 at 9. Carpenter separated and interviewed Skeffington and Geno with Martin's assistance, questioning them about the day's events, Genesis House, and Catanese. Both Skeffington and Geno

4

found the officers' tone towards Catanese to be hostile. Afterward, Martin and Carpenter brought Skeffington and Geno to the front lawn and told them to remain at Genesis House.

Around 7:25 p.m., Waskiewicz, an MSP trooper, arrived with a member of the MSP Crime Scene Services. Skeffington followed them inside as they moved through the house taking photographs and searching through every room. Skeffington saw that her room had been "ransacked" by the troopers. Dkt. 74-1 ¶ 2. At no point did Skeffington or Geno ask any of the officers to leave. The officers left the house around 8:23 p.m. Skeffington observed that every room had been searched, and Catanese later discovered that the closet with his personal papers had been rifled through. The police never obtained a search warrant. Plante died two days later.

### III. **Procedural Background**

Plaintiffs initially brought suit along with two others, asserting sixty-five federal and state claims against five officers arising from police encounters at Genesis House on October 26, 2019, December 4, 2019, and January 23, 2020. On November 15, 2024, the defendants moved for summary judgment on all counts. The motions were fully briefed, and a hearing was held before Judge Joun. Judge Joun granted summary judgment to Defendants Chris Bartolomei and Robert Curtis regarding the October and December 2019 incidents, including all claims in the suit brought by Plaintiffs Kelly Hurley and Nicholas Catanese. The case was

5

subsequently reassigned to this Court for trial on the remaining claims stemming from the January 23, 2020 incident.

Because Judge Joun's docket order did not address Defendants' claims of qualified immunity, the Court revisits the motions for summary judgment with respect to the January 23, 2020 incident. See Daumont-Colón v. Cooperativa de Ahorro y Crédito de Caguas, 982 F.3d 20, 26 (1st Cir. 2020) (explaining that a district court generally may reconsider its prior interlocutory orders); Santiago v. Grp. Brasil, Inc., 830 F.2d 413, 415 n.2 (1st Cir. 1987) (per curiam) (explaining that once a case is transferred to a new judge, that judge is free to reconsider previous rulings to the same extent the previous judge would have been).

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute is one which 'a reasonable jury could resolve . . . in the favor of the non-moving party,' and a material issue is one with the 'potential to affect the outcome . . . under the applicable law.'" Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 108 (1st Cir. 2024) (alterations in original) (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017)). In determining whether to grant summary judgment, a court must construe "the facts in the light most favorable to the non-moving

6

party" and "draw[] all reasonable inferences" in his or her favor. Id. (quoting Harley-Davidson Credit Corp. v. Galvin, 807 F.3d 407, 408 (1st Cir. 2015)).

The party seeking summary judgment "must [first] adumbrate 'an absence of evidence to support the nonmoving party's case.'" Pleasantdale Condos., LLC v. Wakefield, 37 F.4th 728, 733 (1st Cir. 2022) (alteration in original) (quoting Brennan v. Hendrigan, 888 F.2d 189, 191 (1st Cir. 1989)). Once the movant does so, "[t]he burden then shifts to the nonmovant to establish the existence of a genuine issue of material fact." Id. To satisfy this burden, the nonmovant "must present definite, competent evidence" demonstrating that a trialworthy issue exists. Id. (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)). "[C]onclusory allegations, improbable inferences, and unsupported speculation" do not suffice. Kinzer, 99 F.4th at 108 (quoting Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018)).

**DISCUSSION**

I.  **Section 1983 Claims**

Plaintiffs bring claims under 42 U.S.C. § 1983 for alleged violations of their Fourth Amendment rights.[1] Section 1983 provides

---

[1] Plaintiffs pleaded both Fourth and Fifth Amendment violations in their § 1983 counts. Because Defendants are not federal actors, any due process claim under the Fifth Amendment fails. See Collins v. Univ. of N.H., 664 F.3d 8, 12 n.1 (1st Cir. 2011). To the extent Plaintiffs allege violations of other Fifth Amendment rights, they

7

a cause of action against any "person who, under color of" state law, deprives another "of any rights, privileges, or immunities secured by the Constitution" or federal law. 42 U.S.C. § 1983. In addition to denying that Plaintiffs can prove constitutional violations, Defendants have raised the affirmative defense of qualified immunity.

Under the doctrine of qualified immunity, officers are shielded from liability for civil damages unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" Hill v. Walsh, 884 F.3d 16, 21 (1st Cir. 2018) (quoting District of Columbia v. Wesby, 583 U.S. 48, 62–63 (2018)). The Court first considers whether, viewing the record in the light most favorable to Plaintiffs, the evidence supports a constitutional violation by each Defendant. If so, the Court then determines whether the right was clearly established, considering both "the clarity of the law at the time of the violation" and "whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights." Drumgold v. Callahan, 707 F.3d 28, 42 (1st Cir. 2013).

---

do not develop those arguments in their oppositions, and the claims are waived. See Montany v. Univ. of New Eng., 858 F.3d 34, 41 (1st Cir. 2017); Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 57 (1st Cir. 2014). Therefore, the Court construes the complaint to allege Fourth Amendment violations only.

**A.   Constitutional Violations**

   *1.   The Falmouth Defendants*

The Falmouth Defendants argue that their warrantless entries and Martin's protective sweep were justified under the emergency aid exception to the Fourth Amendment and by the consent of the Genesis House residents. Plaintiffs concede that the Falmouth Defendants' entries into the house were justified on these grounds. Instead, Plaintiffs contend that their Fourth Amendment rights were violated when the Falmouth Defendants' actions shifted from rendering aid to Plante to crime investigation, at which point, Plaintiffs argue, the officers' continued presence became unlawful.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. At its "very core," the Fourth Amendment guarantees "the right of [a person] to retreat into his [or her] home and there be free from unreasonable governmental intrusion." Caniglia v. Strom, 593 U.S. 194, 198 (2021) (quoting Florida v. Jardines, 569 U.S. 1, 6 (2013)). Accordingly, "searches and seizures inside a home without a warrant are presumptively unreasonable." United States v. Giambro, 126 F.4th 46, 54 (1st Cir. 2025) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).

"Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." Id. (quoting Stuart, 547 U.S. at 403). Under the emergency aid exception, a warrantless entry is justified when there is "'an objectively reasonable basis for believing' that 'a person within [the house] is in need of immediate aid.'" Hill, 884 F.3d at 19 (alteration in original) (quoting Michigan v. Fisher, 558 U.S. 45, 47 (2009)). The inquiry for whether there was a reasonable basis to believe a need of immediate aid existed is an objective one; an officer's subjective intent or belief is immaterial. See Stuart, 547 U.S. at 404-05.

Here, Martin responded to a 911 call reporting a potential overdose. Upon arrival, she was let in by Geno and immediately assisted Plante. Carpenter arrived shortly thereafter. Though his response to interrogatories later described the situation as a "death investigation scene," Dkt. 63-6 at 9, that description reflects his characterization in hindsight and is not dispositive. What matters is whether, at the time of entry, there was "an objectively reasonable basis for believing" an occupant required emergency aid. Stuart, 547 U.S. at 406. Given the nature of the emergency, Martin's and Carpenter's entries were objectively reasonable. See United States v. Ashworth, 630 F. Supp. 3d 335, 343 (D. Mass. 2022) (holding that a civilian report of a potential overdose at a residence justified officer's warrantless entry).

10

Once inside, Martin's search of Plante's room and the common areas was within the scope of the emergency. An officer entering a home under the emergency aid exception must act "reasonabl[y]" in "the manner and scope of" any ensuing search. United States v. Najar, 451 F.3d 710, 718 (10th Cir. 2006). After EMTs arrived, in accordance with Falmouth Police Department policy, Martin attempted to locate Plante's phone and any evidence of drugs that may have led to the overdose, in order to assist medical personnel in treating Plante. Martin searched Plante's bedroom and the common areas. Her sweep remained narrow and appropriately focused on the emergency. See id. at 720 (holding that a brief search after officers' warrantless entry was reasonable in manner and scope because the officers "did not attempt to search any place beyond the locations where a victim might likely be found" and "confined the search to only those places inside the home where an emergency would reasonably be associated"); Stricker v. Township of Cambridge, 710 F.3d 350, 362 (6th Cir. 2013) (holding that, though it was a "close" call, "a search around the bedrooms and even into the drawers . . . for clues as to what [the person overdosing] ingested, in order to aid EMS in its treatment," was reasonable, particularly because the homeowners had attempted to conceal the overdose from police). Moreover, Skeffington consented to the search and personally guided Martin to the areas. Plaintiffs present no evidence that Carpenter conducted a second search.

11

Skeffington argues that the Falmouth Defendants' instruction to "remain put in the house" amounted to an unlawful seizure. Dkt 75-6 at 14. But the Fourth Amendment only prohibits unreasonable seizures. See United States v. Carmona, 103 F.4th 83, 90 (1st Cir. 2024). Whether an "officer faced an emergency" justifying a warrantless seizure depends on the "the totality of [the] circumstances." Missouri v. McNeely, 569 U.S. 141, 149 (2013). Martin and Carpenter briefly detained and questioned Skeffington while Plante remained in critical condition. There is no evidence that she was detained for an unreasonable period of time. See Illinois v. McArthur, 531 U.S. 326, 332 (2001) (finding two-hour warrantless seizure reasonable in light of exigent circumstance of possible evidence spoliation). Plaintiffs contend the Falmouth officers' true motive was to determine whether Catanese was somehow involved in Plante's overdose. Even if true, asking questions about which drugs were ingested and from whom they came was consistent with the exigency and, under the totality of the circumstances, objectively reasonable. See Stuart, 547 U.S. at 404 (holding that an "officer's subjective motivation is irrelevant" in the Fourth Amendment's emergency aid analysis).

Accordingly, since no reasonable juror could find that the Falmouth Defendants violated Plaintiffs' Fourth Amendment rights in either the search or detention, the Falmouth Defendants are

12

entitled to qualified immunity at the first step of the analysis, and their motions for summary judgment are allowed.

    *2. Trooper Waskiewicz*

Plaintiffs contend that Waskiewicz violated their Fourth Amendment rights by unlawfully entering Genesis House and conducting an overbroad search. Waskiewicz argues that his actions were justified by the exigent circumstances created by Plante's overdose and the earlier consent provided by the Genesis House residents.

The emergency aid exception applies only while the emergency persists. See Giambro, 126 F.4th at 55; see also Kentucky v. King, 563 U.S. 452, 470 (2011) ("Any warrantless entry based on exigent circumstances must, of course, be supported by a genuine exigency."). In addition, the government must "link[] the perceived emergency" to the particular area searched. Giambro, 126 F.4th at 55 (quoting United States v. Martins, 413 F.3d 139, 147 (1st Cir. 2005)).

By the time Waskiewicz arrived, hours after Plante had left for the hospital, the emergency had abated. Martin had already searched Plante's room and the common areas, and Martin and Carpenter had separately questioned both witnesses. With the immediate crisis over, Waskiewicz no longer had an objectively reasonable basis to search the home under the emergency aid exception. See id. at 55 n.7.

13

Waskiewicz argues that he had an objectively reasonable basis for believing that he had consent to enter and search the home because of the prior consent given to Martin. When law enforcement relies on "consent as the basis for their warrantless search, they have no more authority than they have apparently been given by the consent." Commonwealth v. Gray, 990 N.E.2d 528, 540 (Mass. 2013) (quoting 4 Wayne R. LaFave, Search & Seizure § 8.1(c) (5th ed. 2012)). Consequently, a reviewing court must "take account of any express or implied limitations or qualifications attending that consent which establish the permissible scope of the search in terms of such matters as time, duration, area, or intensity." 4 Wayne R. LaFave, Search & Seizure § 8.1(c) (6th ed. 2024); see United States v. Iribe, 11 F.3d 1553, 1558-59 (10th Cir. 1993) (holding that consent to search house did not extend to detached padlocked garage). Ultimately, "[t]he scope of consent is measured by a test of objective reasonableness: 'what would the typical reasonable person have understood by the exchange between the officer and subject?'" United States v. Casellas-Toro, 807 F.3d 380, 391 (1st Cir. 2015) (quoting United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003)).

Here, a reasonable officer would have understood that any consent given to Martin was motivated by the need to render aid to Plante and did not extend to a general search of the whole house conducted hours later. Although the record is disputed as to the

14

scope of Waskiewicz's actions, Plaintiffs present evidence that Waskiewicz photographed and searched every room, including Skeffington's bedroom and Catanese's personal papers. Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that Waskiewicz's conduct exceeded the scope of any valid consent and constituted an unreasonable search under the Fourth Amendment.

    **B.**   **Clearly Established**

Because "there is sufficient evidence to make out [a Fourth Amendment violation], [Waskiewicz] is not entitled to qualified immunity on the first ground" of the analysis. Miranda-Rivera v. Toledo-Dávila, 813 F.3d 64, 72 (1st Cir. 2016). Accordingly, the Court moves to the second element, whether the rights violated were clearly established.

Qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law." Hill, 884 F.3d at 21 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). While plaintiffs need not point to "precedent with 'identical[]' facts," they must show that the law gave officers "fair and clear warning" that their conduct was unconstitutional. Id. at 21–22 (alteration in original) (quoting Alfano v. Lynch, 847 F.3d 71, 76 (1st Cir. 2017)). Three well-developed doctrinal threads were in place by January 2020 that gave Waskiewicz more than a fair warning that his actions were unlawful.

15

First, it was settled that a warrantless entry based on exigent circumstances is limited by the exigency. Since <u>Mincey v. Arizona</u>, the Supreme Court has made clear that a search "must be 'strictly circumscribed by the exigencies which justify its initiation.'" 437 U.S. 385, 393 (1978) (quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 25-26 (1968)); <u>see id.</u> at 395 (rejecting a "murder scene exception" to the Fourth Amendment warrant requirement). By the time Waskiewicz arrived and searched Genesis House, EMTs had already transported Plante to the hospital. Officers had searched his room and common areas and had found no evidence of the drugs Plante had ingested. The search of other residents' rooms exceeded any permissible exigency.

Second, the scope of consent doctrine was clear. Consent is limited to the purpose, area, and time frame that a reasonable officer would understand the resident to have conveyed. <u>See Florida v. Jimeno</u>, 500 U.S. 248, 251 (1991). Though Skeffington led Martin to Plante's bedroom and the common areas, no reasonable officer would think that consent extended to searching every room in the house or rummaging through the owner's papers, especially hours later. <u>See United States v. Infante-Ruiz</u>, 13 F.3d 498, 504-05 (1st Cir. 1994) (where driver consented to search of car, including trunk, consent did not cover passenger's unlocked briefcase in trunk); <u>United States v. Dichiarinte</u>, 445 F.2d 126, 129 (7th Cir. 1971) (consent to search a home for narcotics does

16

not authorize the opening and reading of documents); cf. Gray, 990 N.E.2d at 540 (consent to enter a home does not extend to a search of the premises).

Moreover, the First Circuit has held that where officers state a specific purpose for a consent search, that purpose limits the scope of the search. See United States v. Turner, 169 F.3d 84, 87-88 (1st Cir. 1999) (holding that review of computer files was unconstitutional because it fell outside the expressed object of the consent search to gather concrete, physical evidence of an assault); see also Marshall, 348 F.3d at 287 (explaining that items seized during a search must be related to the expressed object of the consent search). Here, Martin said she was looking for Plante's phone and drugs. The phone was located prior to Waskiewicz's arrival, and no drugs were found. Even if Waskiewicz reasonably believed he had consent to continue investigating what Plante may have ingested, photographing every room and rifling through Catanese's papers were wholly unrelated to that purpose and violated clearly established law that a warrantless consent search must closely hew to the consent given.

Third, and most pointedly, precedent from both the United States Supreme Court and the Massachusetts Supreme Judicial Court ("SJC") clearly established that a second investigatory sweep after an emergency has abated is unconstitutional. See Alfano, 847 F.3d at 78 (stating that law is clearly established through

17

"precedents from the United States Supreme Court, federal appellate courts, and the highest court of the state in which a case arises"). The Supreme Court has repeatedly established that there is no crime scene exception to the warrant requirement, even in the face of a death. See Flippo v. West Virginia, 528 U.S. 11, 14 (1999) (per curiam); Mincey, 437 U.S. at 395.

In 2015, the SJC applied this principle in Commonwealth v. Kaeppeler, 42 N.E.3d 1090 (Mass. 2015). There, police conducted a well-being check after learning that two people who had been drinking with the defendant in his apartment the night before were hospitalized and exhibited symptoms consistent with drug usage. See id. at 1094-95. When the officers arrived, the defendant let them into his home, expressed that he was feeling ill, and agreed to be transported to the hospital. See id. at 1095. After his departure, an officer remained and called in an evidence technician. See id. The technician photographed and seized tequila bottles, one of which later tested positive for a date-rape drug. See id. at 1094-95. The SJC found that though the officers' warrantless entry was justified due to the emergency aid exception and with the consent of the defendant, the subsequent search and seizure were not. See id. at 1096-99. Once the defendant had been transported, the "exigency justifying the warrantless entry to check on the defendant's well-being had ended," and the initial consent did not extend to a warrantless forensic sweep. Id. at

18

1097-99. The SJC added that the seizure might have been reasonable under the emergency aid exception if the police had seized the evidence to determine the contaminant that made people ill. See id. at 1097-98.

Viewing the record in the light most favorable to Plaintiffs, there is evidence that by the time Waskiewicz arrived at Genesis House, any exigency had passed: Plante had already been transported to the hospital, his room had been searched, and no drugs were found. Nevertheless, nearly three hours later, Waskiewicz searched the whole house with a crime scene investigator and photographed every room in the residence. As in Kaeppeler, the justification for the initial entry -- rendering emergency aid -- no longer existed, and any prior consent did not authorize a broad investigatory search. Precedent from the Supreme Court and the SJC gave Waskiewicz a clear warning that such conduct violated the Fourth Amendment. Qualified immunity is therefore unavailable.

II. **False Arrest and False Imprisonment**

The Court now turns to Skeffington's combined state common-law claims for false arrest and false imprisonment. Defendants contend that they are entitled to summary judgment on these claims. Skeffington does not address her false arrest and false imprisonment claims in her oppositions to Defendants' motions for summary judgment. Accordingly, summary judgment is warranted in Defendants' favor. See Montany v. Univ. of New Eng., 858 F.3d 34,

19

41 (1st Cir. 2017) (holding that the plaintiff's failure to put forth any argument in her opposition to the defendants' motion for summary judgment on a particular claim constituted abandonment of the claim); Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 57 (1st Cir. 2014) (finding that the plaintiffs waived a claim after they did nothing to develop the claim and did not address it in their summary judgment papers).

### ORDER

For the foregoing reasons, Officer Martin's and Detective Carpenter's motions for summary judgment (Dkts. 57, 61) are **ALLOWED**. Trooper Waskiewicz's motion for summary judgment (Dkt. 64) is **ALLOWED IN PART** with respect to the false arrest and false imprisonment state-law claims and **DENIED IN PART** with respect to the § 1983 claims.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge